IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Chief Judge Philip A. Brimmer**

Civil Action No. 21-cv-00005-PAB-SBP

MATTHEW IWASKOW,

  Plaintiff,

v.

SAFECO INSURANCE COMPANY OF AMERICA,

  Defendant.

_____

**ORDER**
_____

This matter is before the Court on Defendant Safeco Insurance Company of America's Rule 702 Motion to Exclude and/or Limit Testimony of Plaintiff's Expert Witness Dr. Jeffrey D. Petersohn [Docket No. 81]. Defendant Safeco Insurance Company of America ("Safeco") filed its motion on November 27, 2023. Docket No. 81 at 1. Plaintiff Matthew Iwaskow filed his response on December 18, 2023. Docket No. 85 at 1. Safeco replied on January 2, 2024. Docket No. 91 at 1. The Court has jurisdiction pursuant to 28 U.S.C. § 1332.

**I.   BACKGROUND**

Mr. Iwaskow was involved in a car accident in Boulder Colorado. Docket No. 81 at 1. Mr. Iwaskow drove himself home afterward, but the following day he went to an urgent care provider, complaining of a headache, as well as neck, back, and wrist pain. *Id.* at 2. Despite many years of conservative treatment for chronic lower back pain, Mr. Iwaskow claims that such pain has not gone away. *Id.*

Plaintiff has designated Dr. Jeffrey D. Petersohn, a board-certified anesthesiologist, as an expert in this case.  *Id.*  Dr. Petersohn met with plaintiff on June 2, 2022 to perform an Independent Medical Examination ("IME").  *Id.*  The IME included a physical examination of Mr. Iwaskow, discussions with Mr. Iwaskow about his symptoms and prior medical care, and a review of Mr. Iwaskow's medical records.  *Id.*  Dr. Petersohn prepared an expert report regarding Mr. Iwaskow's alleged pain, the causes of that pain, and his care recommendations.  Docket No. 81-1.  Dr. Petersohn wrote a supplemental report on July 14, 2022, responding to a report by Safeco's retained expert, Dr. Jeffrey Sabin, an orthopedic spine surgeon.  Docket No. 81-2.  Dr. Petersohn was deposed in this matter on July 19, 2022.  Docket No. 81 at 6.

Safeco seeks to exclude three opinions of Dr. Petersohn at trial: (1) that Dr. Petersohn believes Mr. Iwaskow is suffering from radicular nerve pain that is caused by a herniated disc and a vertebral endplate that is probably damaged; (2) that Dr. Petersohn believes that Mr. Iwaskow should have fusion surgery to ameliorate his pain; and (3) that Dr. Petersohn believes that Mr. Iwaskow's motor vehicle accident caused a herniated disc in Mr. Iwaskow's back that has resulted in nerve impingement.  Docket No. 81 at 15; *see also* Docket No. 81-1, 81-2.

II.     **LEGAL STANDARD**

Rule 702 of the Federal Rules of Evidence provides that:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the proponent demonstrates to the court that it is more likely than not that: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

Fed. R. Evid. 702; *see also Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 590–91 (1993).  If challenged by a party opposing the testimony of an expert witness, "[Rule] 702 imposes upon the trial judge an important 'gate-keeping' function with regard to the admissibility of expert opinions." *Mathis v. Huff & Puff Trucking, Inc.*, 787 F.3d 1297, 1307 (10th Cir. 2015) (citation omitted).  However, "[t]he proponent of expert testimony bears the burden of showing that its proffered expert's testimony is admissible." *United States v. Nacchio*, 555 F.3d 1234, 1241 (10th Cir. 2009).  "[T]he proponent has the burden of establishing that the pertinent admissibility requirements are met by a preponderance of the evidence." *Id.* (quoting Fed. R. Evid. 702 advisory committee's note (2000)).

To determine whether an expert opinion is admissible, the court must perform "a two-step analysis."  *Roe v. FCA US LLC*, 42 F.4th 1175, 1180 (10th Cir. 2022); *see also 103 Investors I, L.P. v. Square D Co.*, 470 F.3d 985, 990 (10th Cir. 2006).  First, the court must determine whether the expert is qualified by "knowledge, skill, experience, training, or education" to render an opinion.  *Roe*, 42 F.4th at 1180 (quoting Fed. R. Evid. 702).

Second, if the expert is sufficiently qualified, the proffered opinions must be assessed for reliability.  *Id.* at 1180–81; Fed. R. Evid. 702(b)–(d) (requiring that the testimony be "based on sufficient facts or data," be the "product of reliable principles and methods," and reflect a reliable application of "the principles and methods to the facts of the case").  To perform that function, a court must "assess the reasoning and methodology underlying the expert's opinion, and determine whether it is both scientifically valid and applicable to a particular set of facts."  *Dodge v. Cotter Corp.*, 328

F.3d 1212, 1221 (10th Cir. 2003) (citing *Daubert*, 509 U.S. at 592–93).  In assessing whether a methodology is reliable, a court may consider several non-dispositive factors, including "(1) whether the theory can be tested; (2) whether it is subject to peer review and publication; (3) the known or potential error rate; (4) the existence and maintenance of standards; and (5) the general acceptance in the relevant scientific community." *United States v. Foust*, 989 F.3d 842, 845 (10th Cir. 2021) (citing *Daubert*, 508 U.S. at 593-94).  However, courts have "broad discretion to consider a variety of other factors." *Etherton v. Owners Ins. Co.*, 829 F.3d 1209, 1217 (10th Cir. 2016).  Next, the court must assess whether the expert used sufficient facts and data as required by the methodology and whether the expert reliably applied the methodology to the facts of the case.  *United States v. Crabbe*, 556 F. Supp. 2d 1217, 1223 (D. Colo. 2008)*; see also Roe*, 42 F.4th at 1181.  To demonstrate the reliability of an opinion that is based solely on an expert's experience, the expert "must explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts."  *United States v. Medina-Copete*, 757 F.3d 1092, 1104 (10th Cir. 2014) (quoting Fed. R. Evid. 702, advisory committee notes). Establishing reliability does not require showing that the expert's testimony is indisputably correct.  *United States v. Pehrson*, 65 F.4th 526, 540 (10th Cir. 2023); *see also Goebel v. Denver & Rio Grande W. R.R. Co.,* 346 F.3d 987, 991 (10th Cir. 2003) (discussing how the opinion is tested against the standard of reliability, not correctness).  However, "nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert.  A court may conclude that there is simply too great an analytical gap

between the data and the opinion proffered." *Roe*, 42 F.4th at 1181. "[T]he trial judge must have considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999).

Under Rule 702, a court must also ensure that the proffered testimony is relevant and will assist the trier of fact. *See id.* at 156; *United States v. Rodriguez-Felix*, 450 F.3d 1117, 1122–23 (10th Cir. 2006). "Relevant expert testimony must logically advance[] a material aspect of the case and be sufficiently tied to the facts of the case that it will aid the jury in resolving a factual dispute." *United States v. Garcia*, 635 F.3d 472, 476 (10th Cir. 2011) (quotations and citations omitted). In assessing whether expert testimony will assist the trier of fact, a court should also consider "whether the testimony 'is within the juror's common knowledge and experience,' and 'whether it will usurp the juror's role of evaluating a witness's credibility.'" *Id*. at 476–77 (quoting *Rodriguez-Felix*, 450 F.3d at 1123).

Finally, Federal Rule of Evidence 403 permits a court to "exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403.

### III.   ANALYSIS

Safeco does not challenge Dr. Petersohn's qualifications to provide the expert medical opinions contained in his reports. *See generally* Docket No. 81; Docket No. 92 at 2. Safeco challenges whether three opinions in Dr. Petersohn's expert report are based on sufficient facts and data, are the products of reliable principles and methods,

5

and reflect a reliable application of those methods to the facts of this case.  Therefore, the Court will determine whether the opinions found in Dr. Petersohn's reports are sufficiently reliable.  *Roe*, 42 F.4th at 1181.

### A.  Opinion that Plaintiff has a Herniated Disc that is Causing Radicular Nerve Pain and Motor Deficits

In his June 2022 report, Dr. Petersohn stated that Mr. Iwaskow has a "L4-5 HNP [herniated disc] in the setting of a transitional, likely incompletely sacralized L5 vertebrae with bilateral L5 radicular motor deficits on [his] examination and probable co-existing discogenic/vertebrogenic pain due to traumatic injury of the superior L5 vertebral endplate."  Docket No. 81-1 at 5.  Safeco characterizes this diagnostic impression as Dr. Petersohn opining that Mr. Iwaskow's low back pain is caused by "(1) a herniated disc that is impacting a nerve causing radicular nerve pain and motor deficits; and (2) a 'probable' damaged vertebral endplate."  Docket No. 81 at 5.  Safeco claims that Dr. Petersohn "lacks sufficient facts or dat[a] to reach this opinion, the methodology applied to reach this conclusion is not reliable, and Dr. Petersohn has not reliably applied the methodology to the facts of this case."  *Id.* at 5–6.

More specifically, Safeco asserts that Dr. Petersohn's opinion should be excluded because it is not supported by Mr. Iwaskow's medical history.  *Id.* at 6–10.  Safeco attacks Dr. Petersohn's opinion that Mr. Iwaskow suffers from radicular nerve pain on the grounds that, while Mr. Iwaskow has reported pain radiating into his legs, other doctors seen by Mr. Iwaskow have not found that he suffered from the radicular nerve pain that would be caused by a pinched nerve.  *Id.*  Furthermore, the results of Dr. Petersohn's IME, and specifically the results of Mr. Iwaskow's straight leg raise test, were not replicated in Dr. Sabin's IME.  Second, Safeco argues that Dr. Petersohn's

6

opinion that Mr. Iwaskow has a herniated disc that is impinging a nerve and causing nerve pain is unsupported by Mr. Iwaskow's MRI imaging.  *Id.*  Lastly, Safeco argues that Dr. Petersohn's opinion that Mr. Iwaskow has an endplate injury is not supported by Mr. Iwaskow's medical record and is not based on a "mainstream" theory.  *Id.* at 5 n.1.

      Dr. Petersohn's June 2022 report was prepared after a comprehensive review of Mr. Iwaskow's medical records, treatment notes, and diagnostic imaging compiled through February 2022.  *See* Docket No. 81-1 at 2–5.  The physical examination section of Dr. Petersohn's report indicates Mr. Iwaskow's "[s]traight leg raise is positive bilaterally with dorsal thigh and calf pain produced."  *Id.* at 5.  The report also indicates that his "L4-S1 motor power [is] 5/5 and symmetrical[,] except [his] bilateral ankle dorsiflexion [is] 4/5 and bilateral EHL [is] 4/5."  *Id.*  Dr. Petersohn opines that, "[g]iven the recurrent radicular pain with positive straight leg raise and the motor deficits on resisted ankle dorsiflexion and in the extensor hallucis longus on examination that have never improved more than partially for several weeks following multiple lumbar epidural injections by both interlaminar and transforaminal techniques, the radiculopathies should be considered to be intractable to interventional techniques."  *Id.* at 6–7.  Safeco argues that this is Dr. Petersohn's only support for his conclusion that Mr. Iwaskow has radicular pain caused by a herniated disk impinging a nerve.  Docket No. 81 at 6.

      According to Safeco, Dr. Petersohn's findings of radicular pain and motor deficits "are contradictory to Plaintiff's diagnostics and imagery as well as the conclusions of his numerous treating providers over the past six years."  *Id.*  "There are multiple medical records in which Plaintiff's physicians, which included a neurosurgeon, three radiologists, and a sports physician, stated that Plaintiff's herniated disc was not

7

causing radicular pain or motor deficits." *Id.* at 7.  Safeco highlights Dr. Kara Beasley's statement in Mr. Iwaskow's medical record that, "given his varied distribution of lower extremity pain there is not a clear radicular pattern to indicate nerve impingement." *Id.* at 8 (citing 81-6 at 7).  At his deposition, Safeco's expert, Dr. Sabin, stated that his examination of Mr. Iwaskow, which included a straight leg raise, showed no evidence of radicular nerve pain.  *Id.* at 9 (citing 81-3 at 2).  Dr. Sabin concluded that Mr. Iwaskow has referred pain in the upper portion of his legs, but that this is not consistent with radicular pain, which would extend past Mr. Iwaskow's knee and into his feet.  *Id.*  Safeco also points to the absence of any other doctor in Mr. Iwaskow's medical record discussing radicular pain or motor deficits.  *Id.* at 6–10.

Safeco's second argument is that Dr. Petersohn's opinion is contradicted by Mr. Iwaskow's MRI imaging.  Id. at 7.  Safeco clarifies that it does not challenge whether Mr. Iwaskow has a herniated disc.  Docket No. 92 at 3.  Safeco challenges Dr. Petersohn's opinion that this herniated disc is impinging a nerve and thereby causing Mr. Iwaskow radicular nerve pain.  *Id.*  Safeco argues that, contrary to the opinion in Dr. Petersohn's report, none of Mr. Iwaskow's MRIs show nerve impingement and that Mr. Iwaskow has failed to produce other diagnostic imaging or scientific literature to support Dr. Petersohn's opinion that the herniated disc is impinging a nerve.  Docket No. 81 at 6–10; Docket No. 92 at 3.

Safeco asserts that, in his deposition, Dr. Petersohn acknowledged that Mr. Iwaskow's MRIs showed no direct contact between Mr. Iwaskow's herniated disc and a nerve.  Docket No. 81 at 6.  However, Dr. Petersohn stated that he found the MRIs nondispositive because Mr. Iwaskow's herniated disc affects him while standing, which

8

would not be shown on an MRI taken while Mr. Iwaskow was lying down. *Id.* at 7. Safeco argues that Dr. Petersohn provided no literature or research to support the theory that a standing MRI would detect Mr. Iwaskow's nerve impaction, whereas a prone MRI would not. *Id.* Safeco also cites the testimony of Dr. Sabin, who opined that Dr. Petersohn's prone versus standing MRI theory is not a mainstream opinion supported by good science. *Id.*; Docket No. 81-3 at 9 ("I don't see where there's literature out there that show that the stand up MRI gives more good clinical information than a regular MRI.").

Finally, in a footnote, Safeco argues that Dr. Petersohn's opinion that Mr. Iwaskow's pain is caused by a "probable" damaged vertebral endplate should be excluded. Docket No. 81 at 5 n.1. Safeco contends that, "[a]lthough Dr. Petersohn identifies small amounts of edema on Plaintiff's February 2, 2016 MRI that might indicate an endplate injury, he fails to explain in his report how he determined that it is 'probable' that an actual endplate injury occurred and why this would cause Plaintiff to experience pain." *Id.* (citing 81-1 at 5–6). Safeco supports its argument by noting that its expert opined that the theory of pain from endplate fractures is not "mainstream." *Id.* (citing Docket No. 81-3 at 7–8 ("We've always thought it was a disc that was causing the pain. That's why they do discograms and things like that. But this evolving theory that it's the Nplate has a microfracture is something that I know is out there. It's not mainstream.")).

Mr. Iwaskow makes three responses. First, Mr. Iwaskow states that Dr. Petersohn's opinion was not based solely on the results of the IME. Docket No. 85 at 2. Instead, Mr. Iwaskow asserts that Dr. Petersohn's opinion was based on additional data

9

from Mr. Iwaskow's medical history.  Mr. Iwaskow highlights that, in the history section of Dr. Petersohn's report, he mentions the diagnosis of Drs. Tracy, Katcher, and Mazzola of Mr. Iwaskow's low back pain, as well as the reading of the MRI on May, 7, 2018, which "reported a mild broad-based disc protrusion (herniated disc) with annular tearing at L5-S1." *Id.* at 2–3 (citing Docket No. 81-1 at 3).  Mr. Iwaskow also points to the diagnostic imaging section of Dr. Petersohn's report, which allegedly shows a herniated disk that was bulging at L5-S1.  *Id.* at 3 (citing Docket No. 81-1 at 4–5).

Mr. Iwaskow's second response is that Dr. Sabin's definition of "radicular" pain is too narrow.  *Id.* at 4–5.  Mr. Iwaskow points to a definition provided by Corewell Health that considers radicular pain to be pain that radiates from a person's back and hip into his legs.  *Id.* at 4.  He notes that Dr. Sabin's examination finds that Mr. Iwaskow's pain radiates to his thighs and pelvis, which would fall within this definition.  *Id.*

Finally, Mr. Iwaskow argues that "[w]hether a prone MRI is better or worse than a 'standing MRI' is irrelevant" because Dr. Petersohn determined that Mr. Iwaskow's November 25, 2020 MRI, which was taken while Mr. Iwaskow was prone, shows "impingement of right and left L5 roots due to the L4-5 HNP." *Id.* (alterations omitted) (citing Docket No. 81-1 at 5).  As such, Mr. Iwaskow asserts that Dr. Petersohn's opinion is based on sufficient evidence and that it does not require Dr. Petersohn to rely on a theory that a standing MRI would be required to show Mr. Iwaskow's nerve pain is caused by impingement.  *Id.*

In its reply, Safeco asserts, first, that Dr. Petersohn's reading of the November 2020 MRI is contradicted by the MRI report prepared by Dr. Tobey on August 11, 2021, and, second, that Dr. Petersohn admitted at his deposition that no MRI shows direct

10

contact between the herniated disc and the nerve, although Dr. Petersohn said that impingement is "possible." Docket No. 92 at 4. Safeco contends that Mr. Iwaskow is arguing that Dr. Petersohn's opinion "should trump the opinion of at least three radiologists, who consistently, over a four year period, noted in their MRI reports that there was no nerve impingement." *Id.* at 5.

The Court finds that Mr. Iwaskow has not met his burden of showing by a preponderance of the evidence that Dr. Petersohn's opinion that Mr. Iwaskow's herniated disc is causing radicular nerve pain by impinging a nerve is reliable. *Nacchio*, 555 F.3d at 1241 ("The proponent of expert testimony bears the burden of showing that its proffered expert's testimony is admissible.").

First, concerning the MRIs taken of Mr. Iwaskow's spine, Dr. Petersohn does not dispute other physicians' reading of the MRIs, which show no impingement of the nerve root. Docket No. 81-5 at 8 ("Q:. . . So can you tell me where they're talking about nerve impingement? A: Yes. In the paragraph starting with L5-S1. This closely approximates, however, does not displace the traversing the S1 nerve level. The phrase 'closely approximates' is, it's right next to the nerve. That is indeed what we see . . . ."). Rather, at his deposition, Dr. Petersohn states that the MRIs showed that "there was some concern for potential adjacency to the right S1 nerve root" and that "the disk is going to be physically larger when the person sits or stands than it is when we examine the MRI with the patient on their back." *Id.* at 6. But nowhere does Dr. Peterson explain why "concern for potential adjacency" supports his opinion that the nerve root is impinged. Mr. Iwaskow identifies no studies or any methodology that demonstrates that

11

"adjacency," much less the potential for adjacency, can reliably be used to diagnose nerve root impingement.

Moreover, Mr. Iwaskow has not shown that Dr. Petersohn's interpretation of the November 2020 MRI based on differences between standing and prone MRIs is based on reliable scientific principles. The only evidence as to the reliability of this opinion comes from Dr. Sabin, who testified at his deposition that "I don't see where there's literature out there that show that the stand-up MRI gives more good clinical information than a regular MRI . . . . I know there's -- there's schools have thought about that, but it's not -- again, not mainstream." Docket No. 81-3 at 9. *Daubert*, 509 U.S. at 594 ("Widespread acceptance can be an important factor in ruling particular evidence admissible, and a known technique which has been able to attract only minimal support within the community may properly be viewed with skepticism.") (citation and quotation omitted)).

Mr. Iwaskow has also failed to support Dr. Petersohn's opinion regarding nerve root impingement with non-MRI evidence. Mr. Iwaskow relies upon Dr. Petersohn's IME, where Dr. Petersohn found that the positive result for Mr. Iwaskow's straight leg raises indicated "radicular pain." Docket No. 81-1 at 6–7. However, even putting aside the dispute between Dr. Petersohn and Dr. Sabin regarding the definition of "radicular pain," Mr. Iwaskow has not cited any evidence other than the *ipse dixit* of Dr. Petersohn that the results of Dr. Petersohn's IME revealed nerve root impingement. *Roe*, 42 F.4th at 1181 ("nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert "). The unreliability of Dr. Petersohn's conclusion is emphasized by Dr.

Sabin's inability to observe the same result when he had Mr. Iwaskow perform straight leg raises as part of his IME.  *See* Docket No. 85-4 at 8.  Rule 702 requires the proponent of the expert to show the reliability of the expert's challenged opinion.  *Nacchio*, 555 F.3d at 1241.  Here, Mr. Iwaskow has not demonstrated the reliability of Dr. Petersohn's use of IME tests to diagnose nerve root impingement.  Therefore, the Court finds that Dr. Petersohn's opinion that a herniated disc is impinging a nerve and thereby causing radicular nerve pain should be excluded.

Mr. Iwaskow has also failed to adequately support Dr. Petersohn's conclusion that Mr. Iwaskow has a damaged vertebral endplate that is contributing to Mr. Iwaskow's pain.  Dr. Petersohn's July 2022 report addresses Dr. Sabin's critique of his opinion that a damaged endplate can cause pain.  In his report, Dr. Petersohn states that "[t]he scientific evidence for vertebral end-plate injury as a cause of chronic low back pain is so overwhelming that as of November 2021, ICD code M54.41 has been created to refer specifically to this mechanism of pain production."  Docket No. 81-2 at 4.  Dr. Petersohn further points to three published articles addressing this issue.  *See id.*  However, while this evidence may rebut Dr. Sabin's contention that Dr. Petersohn's theory of endplate damage causing nerve pain is not mainstream, Dr. Petersohn's report fails to support his conclusion that Mr. Iwaskow has endplate damage.

Dr. Petersohn's June 2022 report states that "Modic I changes" – edema – "remain present in all studies in the L5 superior endplate, consistent with possible endplate fracture."  Docket No. 81-1 at 5.  Dr. Petersohn's July 2022 report also states that "aspects of his pain and imaging findings suggest a substantial possibility of co-existing pain of vertebrogenic/discogenic origin."  Docket No. 82-2 at 4.  The report also

13

states "[s]ome physicians rely upon the presence of Modic type I and II changes in the vertebral endplates as seen on MRI study that correlate with symptomatic injury and other physicians prefer diagnostic lumbar provocative or analgesic discography to affirm this diagnosis." *Id.* Dr. Petersohn's reports assert only that an endplate fracture is possible and do not discuss the likelihood of this possibility. Dr. Petersohn's reference to a "substantial possibility" of co-existing vertebrogenic and discogenic pain does not address whether Dr. Petersohn was able to attribute Mr. Iwaskow's pain to a damaged end plate specifically or whether, as Dr. Petersohn notes, "discogenic and vertebrogenic pain share a predominant common neurologic pathway," which makes the source difficult to attribute. *Id.* As such, it is unclear whether Dr. Petersohn's reference to a "substantial possibility" is about the substantial possibility that Mr. Iwaskow's back pain is from either a discogenic or vertebrogenic source, that it is from both sources, or that it is from one but not the other source. Dr. Petersohn's comment that "[s]ome physicians rely upon the presence of Modic type I and II changes in the vertebral endplates as seen on MRI study that correlate with symptomatic injury" does not satisfy Mr. Iwaskow's burden of proving that such reliance is a reliable method of diagnosing endplate damage. Nor does it address why Dr. Petersohn felt that diagnostic lumbar provocative or analgesic discography were not necessary to affirm his diagnosis, as some other physicians require. Because Mr. Iwaskow failed to demonstrate that Dr. Petersohn's opinion is based on sufficient data and a reliable diagnostic method, the Court will exclude Dr. Petersohn's opinion that Mr. Iwaskow's pain may be caused by a possibly damaged endplate.

### B.  Opinion that Mr. Iwaskow Needs Surgical Intervention

Safeco argues that Dr. Petersohn's recommendation that Mr. Iwaskow have surgery, either involving fusion or a total disc arthroplasty, should be excluded because Dr. Petersohn admits that his surgery recommendation would require additional support through further diagnostics and testing.[1]  Docket No. 81 at 10.  Dr. Petersohn's report recommends that Mr. Iwaskow undergo "L4-5 spinal surgery: L4-5 discectomy with instrumented fusion or total disc arthroplasty to be determined by Mr. Iwaskow's neurosurgeon(s) or orthopedic spine surgeon(s) of choice."  Docket No. 81-1 at 6.  The report states that "[i]t is my professional medical opinion to a standard of medical certainty that these surgeries will provide substantial improvement in Mr. Iwaskow's pain and function."  *Id.* at 7.  This opinion appears to be, in part, based on Mr. Iwaskow's extensive, but ineffective, nonsurgical treatment to date.  *See* Docket No. 81-1 at 5, 6; Docket No. 81-2 at 5.

In his June and July 2022 reports, Dr. Petersohn indicates that "[m]edically necessary additional studies [are] required to adequately define the extent and optimal technique for surgery."  Docket No. 81-1 at 6; Docket No. 81-2 at 5.

> Studies fully adequate to define the precise nature and extent of surgical intervention required or provide any support to pursue other interventional strategies have NOT been performed.  Hence, crucial diagnostic information was not gathered to consider the possibility of advanced interventional or surgical treatment because no physician caring for Mr. Iwaskow, nor Dr. Sabin in his review appear to have considered vertebrogenic pain as a mechanism for Mr. Iwaskow's persisting lumbar pain following injury.

---

[1] The Court notes that Mr. Iwaskow has apparently decided to undergo back surgery.  *See* Docket No. 86 at 1.

15

Docket No. 81-2 at 5; Docket No. 81-1 at 2 ("These concerns necessitate the additional treatment and imaging studies discussed in my prior report."). Furthermore, Dr. Petersohn's report indicates that further diagnostic studies may show that injections at the correct spinal level could ameliorate Mr. Iwaskow's pain without the need for surgery because "it is possible that the prior injections did not correctly address the L5 nerve root, but inadvertently addressed the L4 nerve root." *Id.* at 2. Finally, at his deposition, Dr. Petersohn stated that "with regard to the specific kind of surgery [Mr. Iwaskow] would need [ ], these studies have not all been done." Docket No. 81-5 at 5. Safeco argues that Dr. Petersohn "cannot determine if, and what type of, surgery is necessary until further diagnostic testing i[s] performed." Docket No. 81 at 13. Given this, Safeco states that "Dr. Petersohn's opinion that Plaintiff needs a very expensive spinal surgery to eliminate Plaintiff's pain is based on insufficient facts and data . . . and should be excluded as unreliable and unhelpful to the trier of fact." *Id.* The Court disagrees.

Dr. Petersohn's reports show that it is his medical opinion that Mr. Iwaskow requires surgical intervention to treat his pain based on the evidence in Mr. Iwaskow's medical record and Dr. Petersohn's own examination. Docket No. 81-1 at 6. Dr. Petersohn acknowledges that additional studies would customarily be "required to adequately define the extent and optimal technique for surgery," but this does not contradict his opinion as to the advisability of surgery for Mr. Iwaskow. *Id.* Furthermore, Dr. Petersohn's acknowledgment that interventions other than surgery might ease Mr. Iwaskow's pain does not undermine his opinion that surgery is required to fully treat Mr. Iwaskow's pain. As such, the Court will not exclude Dr. Petersohn's opinion on whether

16

Mr. Iwaskow would benefit from surgical treatment of the kind mentioned by Dr. Petersohn.

As noted, Mr. Iwaskow represents to the Court that he intends to undergo back surgery based on the progression of his condition during this litigation and the recently obtained recommendations of several doctors.  Docket No. 86 at 2–3.  The Court has ruled that Mr. Iwaskow's disclosure of new medical evidence regarding his upcoming surgery would require altering the final pretrial order in a way prejudicial to Safeco.  Docket No. 95 at 8.  As such, although the Court finds that Dr. Petersohn may opine on Mr. Iwaskow's need for back surgery, his opinion must be confined to the one he presented in his 2022 expert reports and supported by evidence available to the parties by the end of August 2023, at least for a trial scheduled in February 2024.

### C.  Opinion That the December 15, 2015 Accident Caused Plaintiff's Back Pain

Safeco argues that Dr. Petersohn's opinion that the 2015 accident caused Mr. Iwaskow's back pain should be excluded because it is "based on insufficient facts, uses an unreliable methodology, does not satisfy this Court's causation requirements, [and] is not helpful to the trier of fact."  Docket No. 81 at 15.  Specifically, Safeco argues that Dr. Petersohn's opinion cannot satisfy the requirements of showing specific causation.  *Id.* at 13–14.  "Establishing injury causation requires a showing of both general and specific causation."  *Etherton v. Owners Ins. Co.*, 35 F. Supp. 3d 1360, 1366 (D. Colo. 2014), *aff'd*, 829 F.3d 1209 (10th Cir. 2016).  "General causation describes whether a particular accident or event is capable of producing a particular injury.  Specific causation is determining whether a particular accident or event caused the direct injury alleged to have been suffered."  *Murphy-Sims v. Owners Ins. Co.*, No. 16-cv-0759-

CMA-MLC, 2018 WL 8838811, at *5 (D. Colo. Feb. 27, 2018) (citations omitted). Safeco does not dispute that Dr. Petersohn's opinion satisfies the general causation requirement. Docket No. 81 at 14 ("Dr. Petersohn's opinion appears to satisfy the general causation requirement"). However, it argues that, in Dr. Petersohn's report, "he provides no explanation about [the] mechanism of injury, how the Accident could have caused a herniated disc or vertebral endplate injury, and what methodology he employed to reach this opinion." *Id.* (footnote omitted).

Mr. Iwaskow responds that there is no evidence that Mr. Iwaskow had a herniated disc before his accident and that "Mr. Iwaskow consistently reported to his treaters, and their treatment was based on his statements, that the car accident of December 15, 20[15] was the source of his injuries." Docket No. 85 at 8.

In its reply, Safeco argues that "the primary issue with Dr. Petersohn's specific causation opinion is that it rests entirely on his claim that a herniated disc, caused by the Accident, is causing Plaintiff's pain." Docket No. 92 at 9. Safeco argues that, because "Dr. Petersohn has not established that his opinion that the herniated disc is impacting Plaintiff's nerve and causing pain is supported by sufficient facts or data and involves a reliable methodology," his opinion that the car accident has caused Mr. Iwaskow's pain should be excluded. *Id.*

The nature of Safeco's Rule 702 challenge is difficult to discern. To the extent it is based on Dr. Petersohn expressing the opinion that the accident caused nerve root impingement, the Court has already excluded Dr. Petersohn's opinion regarding the existence of nerve root impingement, so the argument is moot. If Safeco's argument is

18

that Dr. Petersohn cannot opine that the accident caused a disc herniation, the Court will reject it.

Dr. Petersohn's report states that he has examined Mr. Iwaskow's medical records and has seen no evidence of any pre-existing injury to Mr. Iwaskow's spine. Docket No. 81-1 at 3 ("There was no significant history of low back pain in the several years prior to the MVC."). However, the day after the accident, Mr. Iwaskow went to Boulder Community Hospital, complaining of neck and back pain. *Id.*; Docket No. 85-4 at 10–11. X-rays were taken and the report indicates a mild disc height narrowing at L5-S1. *Id.* at 11. At the hospital, Mr. Iwaskow was "given a presumptive diagnosis of acute strain neck and low back pain." Docket No 81-1 at 3. The X-rays were followed up by a series of MRIs taken from February 2016 through May 2018, which included a finding that there was a mild broad-base disc protrusion with annular tearing at the L5-S1 level. Docket No. 85-4 at 11–16. Subsequent periodic images of Mr. Iwaskow's spine have consistently shown a herniation. *Id.* at 16–19. While an expert witness cannot base a specific causation opinion solely on the fact that injury occurred shortly after an accident, *Goebel v. Denver & Rio Grande W. R.R. Co.*, 346 F.3d 987, 999 (10th Cir. 2003) (an expert cannot "rely on the temporal relationship [between an injury and a purported cause] by itself as evidence of causation"), "[t]he temporal relationship between an injury and a purported cause can be a relevant factor in a broader causation determination." *Etherton v. Owners Ins. Co.*, 829 F.3d 1209, 1220–21 (10th Cir. 2016). Here, Dr. Petersohn bases his opinion that disc herniation occurred as a result of the accident on the additional facts that Mr. Iwaskow had no pre-existing

injuries to his spine and the absence of any other possible cause of the herniated disc.[2] Under these circumstances, the Court finds that Dr. Petersohn's opinion that the accident caused the herniated disc, at least as observed in the imaging taken at the urgent care facility and early MRI imaging, is sufficiently reliable.[3]

## IV.   CONCLUSION

It is therefore

**ORDERED** that Defendant Safeco Insurance Company of America's Rule 702 Motion to Exclude and/or Limit Testimony of Plaintiff's Expert Witness Dr. Jeffrey D. Petersohn [Docket No. 81] is **GRANTED in part** and **DENIED in part**.

DATED February 2, 2024.

BY THE COURT:

PHILIP A. BRIMMER
Chief United States District Judge

---

[2] Dr. Sabin's expert report also concludes that "[i]t is my opinion that, with the lack of any pre-subject accident low back issues, that the claimant's low back pain is a direct result of the subject accident and presented itself proximate to the subject accident."  Docket No. 85-4 at 22.

[3] Safeco does not contest Dr. Petersohn's qualifications, and the Court finds that Dr. Petersohn is sufficiently qualified and has sufficient information to opine that a herniated disc would cause Mr. Iwaskow's pain.